1  John Ward
2  584 Castro Street, No. 802
   San Francisco, 94114
3  (415) 255- 4996
   California Bar No. 102449
4  johnpward@gmail.com

   E-filing

5  Appearing Specially for Petitioner
   MARCO ANTONIO LOPEZ

6

7              UNITED STATES DISTRICT COURT
8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

                                                    MHP

9  MARCO ANTONIO LOPEZ,              No. 08        1452
10
                  Petitioner,        **PETITION FOR WRIT OF HABEAS**
11                                   **CORPUS BY A PERSON IN STATE**
          vs.                        **CUSTODY**
12
   CALIFORNIA DEPARTMENT OF
13 CORRECTIONS,
14                Respondent.
15
16
17
18
19
20
21
22
23
24
25
26
27
28

         PETITION FOR HABEAS CORPUS AND MEMORANDUM

# TABLE OF CONTENTS

PETITION FOR HABEAS CORPUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

     Trial Court Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

     Direct Appeal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

     Attorneys Representing Petitioner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

     Specific Grounds for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

     Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

MEMORANDUM IN SUPPORT OF PETITION FOR HABEAS CORPUS . . . . . -6-

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

THE CALIFORNIA COURTS UNREASONABLY APPLIED CONTROLLING
SUPREME COURT PRECEDENT IN AFFIRMING PETITIONER'S CONVICTION
DESPITE THE CALIFORNIA TRIAL COURT'S FAILURE TO PROVIDE THE JURY
IN THIS CASE WITH A CLEAR INSTRUCTION THAT, FOR THE FELONY
MURDER TO APPLY IN THIS CASE, THE KILLING THAT OCCURRED HAD TO
BE PART OF A "CONTINUOUS TRANSACTION" WITH THE UNDERLYING
FELONIES OF BURGLARY AND ROBBERY. . . . . . . . . . . . . . . . . . . . . . . . . -18-

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

# TABLE OF AUTHORITIES

*Conde v. Henry,* 198 F.3d 734 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . -18-

*Estelle v. McGuire*, 502 U.S. 62 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

*Hennessy v. Goldsmith*, 929 F.2d 511 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . -18-

*In re Winship*, 397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

*People v. Sakarias*, 22 Cal.4th 596 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . passim

*California v. Trombetta*, 467 U.S. 479, 485 (1984) . . . . . . . . . . . . . . . . . . . . . -22-

*United States v. Gaudin*, 515 U.S. 506 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . -22-

Cal. Pen. Code, § 187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

Cal. Pen. Code, § 190.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

Cal. Pen. Code, § 211 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

Cal. Pen. Code, § 459 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

Cal. Veh. Code, § 10851  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

PETITION FOR HABEAS CORPUS AND MEMORANDUM

**PETITION FOR HABEAS CORPUS**

Petitioner MARCO ANTONIO LOPEZ files this petition pursuant to 28 U.S.C. Section 2254 et seq., and alleges as follows:

1.  Petitioner MARCO ANTONIO LOPEZ is being unlawfully held in custody by the California Department of Corrections at Susanville, California, by respondent, his agents and employees.

Trial Court Proceedings

2.  The name and location of the Court which entered the judgment of conviction and sentence under attack in this petition is the Superior Court of the State of California, County of Sonoma, Santa Rosa, California; Case Number SCR-33440..

3.  The date of the judgment of conviction and sentence is August 18, 2005.    The sentence is 25 years to life.

4.  Petitioner was charged by Information with murder with with special circumstances, Cal. Pen. Code, §§ 187, 190.2(a)(17; robbery, Cal. Pen. Code, § 211; burglary, Cal. Pen. Code, § 459; and taking a vehicle, Cal. Veh. Code, § 10851.

5.  Petitioner pleaded not guilty and denied the special allegations.

6.  Petitioner was tried by a jury and, on December 21. 2004, he was found guilty on all counts.

7.  Petitioner testified at trial.

Direct Appeal Proceedings

8.  Petitioner appealed his conviction to the California Court of Appeal for the First Appellate District, Division Four.  The claim presented was:

    THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY THAT THE KILLING OF MR. FOWLER AND THE UNDERLYING FELONIES OF BURGLARY AND ROBBERY WERE REQUIRED TO HAVE BEEN PART OF ONE "CONTINUOUS TRANSACTION" IN ORDER FOR THE FELONY MURDER RULE TO APPLY

1  PREJUDICIALLY VIOLATED APPELLANT'S FIFTH, SIXTH AND
2  FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS AND A
3  FAIR TRIAL BY JURY AND REQUIRES REVERSAL OF THE
4  JUDGMENT.
5
6  9.  The Court of Appeal affirmed the judgment on October 23, 2006. (A111797.)
7  10. Petitioner filed a petition for review in the California Supreme Court. The issue
8      presented was:
9      WHETHER PETITIONER WAS PREJUDICIALLY DEPRIVED OF
10     HIS FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR TRIAL
11     AND TO PRESENT A DEFENSE BECAUSE THE JURY
12     INSTRUCTIONS GIVEN IN THIS CASE DID NOT FAIRLY
13     PRESENT THE JURY WITH THE ISSUE OF WHETHER THE
14     KILLING IN THIS CASE WAS PART OF A CONTINUOUS
15     TRANSACTION OR WHETHER, ON THE CONTRARY, THE
16     VICTIM'S FELONIOUS SEXUAL ASSAULT ON PETITIONER, A
17     BOY OF FIFTEEN AT THE TIME, TOOK THIS CASE OUT OF THE
18     FELONY MURDER RULE.
19
20 11. The California Supreme Court denied review on February 7, 2007. (S148184.)
21 Attorneys Representing Petitioner
22 12. The following attorneys, all of whom were court appointed, have represented
23     petitioner:
24             (1)   From arraignment through sentencing: Office of the Sonoma
25                   County Public Defender.
26             (2)   On appeal: John Ward
27 Specific Grounds for Relief
28

13. Petitioner is being held unlawfully and in violation of the Constitution and laws
of the United States. Specifically, petitioner alleges as follows:

14. Petitioner is entitled under the Fifth, Sixth and Fourteenth Amendment to a jury
instruction that embodies his sole defense. In the present case, petitioner was
convicted of felony murder, i.e., that he killed the victim in this case in the course
of a robbery and burglary. Petitioner contended that the felony murder rule did not
apply, because, under California law, the killing and the underlying felony felony must
be part of one "continuous transaction." Petitioner contended that the victim in
this case, who had a history of sexually abusing teen-aged boys, attempted to
molest him and that he killed the victim in an explosive rage and that the killing
was therefore not part of a "continuous transaction" with the underlying
robbery/burglary.

15. Petitioner's account of what transpired prior to the killing entitled him to the
following instruction:

In order for the People to prove that the defendant is guilty of murder
under a theory of felony murder [and that the special circumstance of
murder committed while engaged in the commission of
_____ *<insert felony>* is true], the People must prove that
the _____ *<insert felony>* [or attempted
*<insert felony>*] and the act causing the death were
part of one continuous transaction. The continuous transaction may occur
over a period of time and in more than one location.

In deciding whether the act causing the death and the felony were part of
*one continuous transaction,* you may consider the following factors:

1. Whether the felony and the fatal act occurred at the same
place;

2. The time period, if any, between the felony and the fatal
act;

3. Whether the fatal act was committed for the purpose of
aiding the commission of the felony or escape after the
felony;

4. Whether the fatal act occurred after the felony but while
[one or more of] the perpetrator[s] continued to exercise
control over the person who was the target of the felony;

5. Whether the fatal act occurred while the perpetrator[s]
(was/were) fleeing from the scene of the felony or
otherwise trying to prevent the discovery or reporting of the
crime;

6. Whether the felony was the direct cause of the death;

AND

7. Whether the death was a natural and probable
consequence of the felony.

It is not required that the People prove any one of these factors or any
particular combination of these factors. The factors are given to assist you
in deciding whether the fatal act and the felony were part of one
continuous transaction.

(1-500 CALCRIM 549.)

16. If the jury had been given this instruction, it is reasonably probable that they
would have found that the felony murder rule did not apply in this case and that
petitioner was guilty of no more than manslaughter.

17. In rejecting petitioner's claim that the failure to give the foregoing instruction
deprived him of his sole defense, in violation of his federal constitutional right to

1  a fair trial, the California courts unreasonably applied federal constitutional law,

2  as found in controlling Supreme Court precedent.

3     18.   The unreasonable application of federal constitutional law by the courts of

4  California had a substantial and injurious effect on the outcome of this case.

**Prayer for Relief**

6     WHEREFORE, petitioner prays that the Court:

7     1.   Issue a writ of habeas corpus to have petitioner brought before it so that he

8           might be discharged from his unconstitutional confinement.

9     2.   Conduct a hearing at which proof may be offered concerning the

10          allegations contained in this petition;

11    3.   Permit petitioner, who is indigent, to proceed without prepayment of costs

12          and fees; appoint counsel to represent him; grant petitioner authority to

13          obtain subpoenas without fee for witnesses and documents necessary to

14          prove the facts alleged in this petition; and grant petitioner sufficient funds

15          to secure expert testimony necessary to prove the facts alleged in this

16          petition.

17    4.   Grant such other and further relief as the Court deems just and appropriate.

19  DATED: March 12, 2008

21  By: _____

22          John Ward, Appearing Specially for

23          Petitioner Marco Antonio Lopez

# MEMORANDUM IN SUPPORT OF PETITION FOR HABEAS CORPUS

## STATEMENT OF THE CASE[1]

An amended information filed November 8, 2004 charged petitioner with the murder of Gordon Lee Fowler on or about October 9, 2002. (Cal. Pen. Code, §187.)[2]

It was alleged that the murder was committed in the course of a robbery and burglary, special circumstances within the meaning of California Penal Code section 190.2, subdivision (a)(17). (Count I.) Petitioner was further charged with the robbery of Gordon Lee Fowler (§ 211; Count II);[3] burglary of the dwelling of Gordon Lee Fowler (§ 459; Count III); and with the taking of automobile belonging to Gordon Lee Fowler (Veh. Code, § 10851; Count IV.) It was additionally alleged that the crime involved great violence and great bodily harm; that petitioner was armed with or used a weapon; that the victim was particularly vulnerable; and that the crime involved taking or damage of great monetary value. (II CT 284-287)[4] Petitioner pleaded not guilty and denied the special allegations. (IV RT 406.)

---

[1] The Statement of the Case and the Statement of Facts are taken, with a few modifications, from the opening brief submitted on behalf of petitioner in the California Court of Appeal. The citations are to the Clerk's and Reporter's Transcripts on appeal to that Court.

[2] Further unspecified statutory references are to the California Penal Code.

[3] In connection with Count II, it was alleged that petitioner inflicted great bodily injury on a victim over the age of 70. (§ 12022.7, subd. (c).)

[4] Originally, petitioner was charged with a co-defendant, Miguel Olivera (see I CT 166-69); however, Mr. Olivera's case was severed (see I RT16), and he pleaded guilty to being an accessory to the murder, as well as robbery, burglary, and conspiracy to commit robbery. Subsequently, he testified against petitioner. (See II CT 298.)

1   A jury was impaneled and the taking of evidence began on November 23, 2004.

2   (II CT 462.) Jury deliberations began in the late afternoon of December 14, 2004 (II CT

3   481) and on December 21, 2004 the jury found petitioner guilty of murder with special

4   circumstances (robbery and burglary) and also guilty of robbery, burglary, and the

5   taking of a vehicle. The jury found that petitioner inflicted great bodily injury on a

6   victim over the age of 70 and found that petitioner was armed with a knife and that the

7   crime involved taking property of great monetary value. The found it not true that the

8   victim was especially vulnerable and not true that the crime involved a high degree of

9   cruelty. (II CT 488-489.)

10  On August 18, 2005, the court sentenced petitioner to 25 years to life on Count

11  I, staying sentence on the other offenses. (II CT 530; see Pen. Code, § 190.5, subd. (b).)

12  A restitution fine of $10,000.00 was imposed (§§ 1202.4, 1202.45) and petitioner was

13  awarded 799 days actual credit for time served awaiting trial (II CT 528, 531.)  A

14  timely notice of appeal was filed on October 14, 2005. (II CT 532.)

15  On October 23, 2006, the California Court of Appeal, First Appellate District,

16  Division Four, affirmed the judgment, and the California Supreme Court denied review

17  on February 7, 2008.

18  **STATEMENT OF FACTS**

19  The body of Gordon Lee Fowler was found, in a state of decay, at Mr. Fowler's

20  home on the outskirts of Sebastopol on the morning of October 9, 2002. (XII RT 1822-

21  1825, 1832.) The body was blood-stained and lying on the floor near the bathroom. One

22  of the front pockets of Mr. Fowler's pants was turned out, and a checkbook and register

23  were found near the body.[5] (XII RT 1842-1844.) A coin purse and some coins were

24  found on the porch near the house, near the body, as well as a screwdriver.[6] (XII RT

25

26  It did not appear that the house had been ransacked. (XII RT 1860.)

27  The body was fully dressed. The belt was buckled and zipper of the fly was pulled up.

28  (XII RT 1847.)

1834, 1841, 1850, 1862.)    No usable fingerprints were found at the scene. (XII RT 1869.)

Mr. Fowler's automobile was later found by the police about a mile from his home. (XII RT 1853-1854, 2078.)

An autopsy revealed that Mr. Fowler had been stabbed nearly 50 times to the head and neck, front and rear torso, and upper extremities. (XIII RT 2011-2013.) The autopsy physician estimated that Mr. Fowler had been dead for a week to ten days prior to the finding of his body. (XIII RT 2016.) There were defensive wounds on the body. (XIII RT 2019.) Mr. Fowler bled to death as a result of the stab wounds, which included three fatal wounds to the heart. (XIII RT 2020.)[7] The autopsy physician characterized the wounds as calling to mind a "rage stabbing"; that is to say, the stabbing continued after Mr. Fowler was dead, although he could not say that this particular killing was, in fact a "rage killing." The doctor thought that perhaps it would have been better to have used the word "overkill," the infliction of more injury than necessary to achieve the attacker's objective. (XIII RT 2025, 2054-2055, 2067-2068.)    The killing remained unsolved from October, 2002 until June, 2003. (XIII RT 2079-2080.) On June 16, 2003, Miguel Olivera contacted the Sebastopol police. (XIII RT 2082.)[8] After making a statement,[9] Mr. Olivera, without prompting, took two Sebastopol police detectives to the location on Cooper Road in Sebastopol where the killing occurred. (XIII RT 2083.) Mr. Olivera then led the police to the place where Mr. Fowler's automobile was found after his body was discovered. (XIII RT 2084.) He then took the police to the drainage ditch where the

---

[7] According to the examining physician, Mr. Fowler was stabbed a number of times before his heart stopped. (XIII RT 2024.)

[8] Detective Dave Thompson of the Sebastopol police, who speaks Spanish, was called in to conduct the interview. Detective Thompson testified that Olivera told him he wanted to get some things "off his chest" so that he could sleep better. (XV RT 2413-2414.)

[9] As part of his statement, Mr. Olivera drew a map showing where the events occurred. (XV RT 2417.)

1 | keys to Mr. Fowler's car had been thrown, and a set of keys was subsequently recovered.
2 | (XIII RT 2085.) Mr. Olivera pointed out the place where he thrown the knife used in the
3 | stabbing and Mr. Fowler's wallet, but these items were never recovered. (XIII RT 2086-
4 | 2087.)

5 |        After he made his revelations, Mr. Olivera was not arrested. Instead, he was fitted
6 | with a body wire and sent to find petitioner and have a conversation with him.[10] The
7 | police bought some beer for Mr. Olivera to take along as an enticement for petitioner to
8 | separate from the people he was hanging out with and go and speak with Mr. Olivera.
9 | After monitoring the conversation that took place between Mr. Olivera and petitioner,[11]
10 | the police took petitioner, who was 15 years old at the time,[12] into custody. (XIII RT
11 | 2087-2090, XV RT 2421.)

12 |        After he was arrested, petitioner was informed of his *Miranda* rights and then
13 | made a statement, which was recorded and videotaped. (XIII RT 2098-2100.)[13]

14 |        The principal prosecution was Mr. Olivera, who had formerly been petitioner's co-
15 | defendant.[14] Mr. Olivera had lived in Sonoma County since 2000 and worked as a day
16 | laborer, as a gardener. (XVII RT 2807.) Prior to October 2002, Mr. Olivera had known
17 | petitioner for a year or two, but merely as an acquaintance. (XVII RT 2808-2809, 2864.)
18 |        The events leading up to Mr. Fowler's death began when Mr. Fowler approached

19

[10] Mr. Olivera's purpose was to obtain a confession from petitioner that would reduce
20 Mr. Olivera's culpability. That was also the aim of Detective Thompson, the detective
21 who sent Mr. Olivera to talk to petitioner. (XVIII RT 3020-3021.)

[11] In the conversation, Mr. Olivera stated that both of them had gone to rob Mr. Fowler.
22 He stated that he did this as a way to get petitioner to tell the truth. (XVIII RT 3021-
23 3023.)

[12] Petitioner was born August 24, 1987 (XX RT 3441.)
24

[13] To the knowledge of the primary interviewer, Detective Thompson, petitioner was not
25 told prior to the interview that a killing in the course of a robbery was considered murder.
26 (XIV RT 2251.)
27

[14] Mr. Olivera was 29 years old at the time of his testimony. He was married and the
28 father of one child. (XVII RT 2807.)

PETITION FOR HABEAS CORPUS AND MEMORANDUM                    -9-

1  Mr. Olivera, ostensibly to do some work for him. As events unfolded, when Mr. Fowler
2  and Mr. Olivera reached Mr. Fowler's home, the latter propositioned Mr. Olivera for sex
3  and "grabbed" him. Mr. Olivera struck Mr. Fowler, knocking him to the ground. Mr.
4  Fowler had his wallet in his hand when this happened, and Mr. Olivera took it and ran
5  off. (XVII RT 2810-2814.)

6      About two days later, Mr. Fowler again approached Mr. Olivera. Mr. Olivera
7  asked Mr. Fowler if he wanted his wallet back, but Mr. Fowler said he did not. Instead,
8  he asked Mr. Olivera if he could put him on to some young men or young boys for sex.
9  Mr. Olivera brusquely refused and threatened to go to the police but Mr. Fowler showed
10 him what he believed be a gun[15] and threatened to kill him if he did so.[16] (XVII RT 2814-
11 2816.) Afterwards, talking to the other Mexican day laborers, Mr. Olivera learned that
12 Mr. Fowler had propositioned several of them. (XVII RT 2816-2817.)

13     Mr. Fowler appeared again within the next few days. Once again, Mr. Olivera told
14 him to "get lost." On this occasion, petitioner was standing nearby and asked Mr. Olivera
15 who Mr. Fowler was. Mr. Olivera told him that he, Mr. Olivera, had been propositioned
16 by Mr. Fowler at the latter's house, and that he had hit Mr. Fowler and taken his wallet.
17 Mr. Olivera suggested to petitioner that it would be easy for petitioner to enact the same
18
19
20

_____

21  Mr. Lopez later learned from petitioner that it was in actuality a knife. (XVII RT
22 2816.) This transpired after the killing, when the two were driving away. Mr. Olivera
   mentioned that Mr. Fowler had a gun, and petitioner pulled from his pocket a knife that
23 he had taken from Mr. Fowler, that had appeared to Mr. Olivera to be a gun. (XVII RT
   2829-2830.)
24

25  On cross-examination, Mr. Olivera stated that the threat occurred on a different day –
   the day that petitioner went with Mr. Fowler. (XVIII RT 3007.) Mr. Olivera stated that
26 when he testified earlier that he had forgotten that Mr. Fowler had a weapon when he
   spoke to petitioner moments after the threat, what he meant was that he did not tell
27 petitioner that Mr. Fowler had a weapon. (XVIII RT 3008; see XX RT 3437 [in
   statement to detectives, Mr. Olivera states threat occurred same day that petitioner went
28 with Mr. Fowler].)

1  scenario.[17] If he was successful, he should, in return, invite Mr. Olivera for beer. He did
2  not mention that Mr. Fowler had a weapon. (XVII RT 2817-2819.) Petitioner said he
3  would go, which, to Mr. Olivera, meant that petitioner would steal Mr. Fowler's wallet.
4  (XVII RT 2820-2821.) However, on cross-examination, Mr. Olivera testified that he was
5  joking when he suggested the robbery and that, in fact, petitioner had responded to the
6  suggestion by saying, "No way." (XVII RT 2901-2903.)[18]

7       After petitioner left, Mr. Olivera drank two bottles of beer and began to have
8  second thoughts, realizing that it was stupid to have told petitioner to go with Mr. Fowler.
9  It dawned on him that petitioner may not have understood that he was joking, and that he
10  really did not know what petitioner had in mind when he went with Mr. Fowler.[19] (XVII
11  RT 2822, 2903-2905.) Mr. Olivera took his bicycle and went to Mr. Fowler's house. As
12  he arrived, petitioner came towards him, bloody and holding a large kitchen knife and the
13  keys to Mr. Fowler's car. He told Mr. Olivera that he had stabbed Mr. Fowler about 30
14  times and had killed him. (XVII RT 2821-2824, 2826.)

15       Petitioner told Mr. Olivera that they had to get away from the scene. They left in
16  Mr. Fowler's car, with Mr. Olivera driving. Petitioner had Mr. Fowler's wallet. Mr.
17  Olivera asked for some of the money that had been taken from Mr. Fowler and petitioner
18  gave him some, saying that it was half of what had been taken.[20] Mr. Olivera left the car
19  near an apple orchard. He told petitioner to take off his shirt, and he used it to wipe

20

---

[17] On cross-examination, Mr. Olivera acknowledged that, when he was interviewed at the sheriff's substation, he may have denied suggesting to petitioner that it would be easy to rob Mr. Fowler, and that doing so would cure Mr. Fowler of bothering the day workers. (XVII RT 2898.) He also insisted that it was petitioner's "own decision" to go with Mr. Fowler. (*Ibid.*) He said that "I did, and yet I didn't" want petitioner to go and rob Mr. Fowler. He was confused. (XVII RT 2898-2899.)

[18] The whole conversation took no more than three minutes. (XVII RT 2901.)

[19] Mr. Olivera testified that he thought petitioner was 18 rather than 15 because he was out late at night drinking beer and smoking marijuana. (XVII RT 2903.)

[20] Mr. Olivera told the detectives that the amount taken was about $1200. (XX RT 8429.)

PETITION FOR HABEAS CORPUS AND MEMORANDUM                          -11-

1  steering wheel clean. (XVII RT 2426-2429.) The two walked away together, and Mr.
2  Olivera discarded the knife, the wallet, the car keys, and the shirt at various places along
3  the route. (XVII RT 2830-2831.)

4      Petitioner, who appeared to be very frightened, never explained to Mr. Olivera
5  why he stabbed Mr. Fowler so many times. He told Mr. Olivera not to tell anyone what
6  happened. (XVII RT 2831.)

7      Mr. Olivera was afraid of the consequences if he went to the police, so he kept
8  silent. (XVII RT 2832.) The following June, Mr. Olivera's conscience bothered him to
9  the point that he went to the police. (XVII RT 2832-2833.) He had seen petitioner that
10  morning and told him that what happened had been his, Mr. Olivera's, fault and that they
11  should go to church and confess their sin. He did not mention that he was going to the
12  police. (XVII RT 2833-2834.) After making his statement to the detectives, Mr. Olivera
13  approached petitioner wearing a wire and carrying a 12-pack of beer. (XVII RT 2834-
14  2835.) Petitioner admitted stabbing Mr. Fowler at least 30 times. All he would say about
15  why he had done this was that he had gotten carried away and that Mr. Olivera should not
16  talk about it. (XVII RT 2836-2838.) Petitioner did not have any particularly remarkable
17  affect during this conversation. (XVII 2837-2838.) According to Mr. Olivera, the one
18  important statement that petitioner made that was not recorded by the wire was when
19  petitioner stated that Mr. Olivera had not been present during the stabbing. (XVII RT
20  2857.)

21      Mr. Olivera acknowledged that he had been charged with murder, robbery and
22  burglary in this case and faced a life sentence.[21] He signed an agreement to testify
23  truthfully and pleaded guilty to lesser charges in exchange for an agreed sentence of ten
24  years in prison. He understood that if he did not testify truthfully he would be charged
25
26  ⸻⸻⸻⸻

27  On cross-examination, Mr. Olivera acknowledged that he had feared that he would be
   executed for his involvement in the crime. (XVIII RT 3015.) He was also afraid that he
28  would be killed in prison because he testified against petitioner. (XVIII RT 3026.)

1  with an additional crime for false testimony and that the murder charge would be re-filed.

2  (XVII RT 2847-2852.)[22]

3  **DEFENSE CASE**

4  Raymond Green[23] testified about interactions that he had with Mr. Olivera. He

5  described an unprovoked[24] and extensive series of threats and menaces. (See XVIII RT

6  3044, 3047.) For example, Mr. Olivera would block Mr. Green's way in the street, curse

7  him in Spanish, and "moon" him, or simply stand in front of Mr. Green's house and stare.

8  (XVIII RT 3045.)    The level escalated in 2003[25] when Mr. Olivera brandished a club

9  at Mr. Green, who ran away in order to avoid getting hit. (XVIII RT 3046-3047.) About

10  two weeks later, Mr. Olivera swung a belt with a heavy metal buckle at Mr. Green,

11  accompanying the attack with yelling and cursing. (XVIII RT 3048-3049.) He attempted

12  to get away on his bicycle, only to encounter Mr. Olivera again shortly afterwards. This

13  time, Mr. Olivera used a big stick to threaten Mr. Green. (XVIII RT 3049-3051.)

14

15

16

---

17  [22] Mr. Olivera acknowledged that he tried to obtain a lower sentence, although he insisted
18  that "I only want justice," and only wanted to clarify that he had not done the murder.
    (XVIII RT 3014.)

19
    [23] Mr. Green, at the time of his testimony, was in his late fifties or early sixties. (See
20  XVIII RT 3043.)

21  [24] On one occasion, however, Mr. Olivera was working for a neighbor of Mr. Green's
22  putting up fence. Mr. Green called the neighbor to prevent Mr. Olivera from putting the
    fence on Mr. Green's side of the property line. (XVIII RT 3051.) Mr. Green had also
23  called the Sheriff's Department on occasion, complaining about the day laborers drinking
    in public near his house, but he never singled Mr. Olivera out individually. (XVIII RT
24  3054.) He also complained to the county about people living in a condemned trailer near
    his house, and he thought that might have been an additional reason for Mr. Olivera's
25  anger at him. (XVIII RT 3056.)

26  [25] Mr. Green kept notes of these encounters and referred to them during his testimony.
27  (XVIII RT 3052.) He also tape recorded some of them. (XVIII RT 3058.) He
    acknowledged an antagonistic relationship with the Hispanic day laborers in the town,
28  due to their drinking and noise. (XVIII RT 3060.)

PETITION FOR HABEAS CORPUS AND MEMORANDUM                    -13-

1        The final incident that Mr. Green recounted around the same time, when Mr.
2  Olivera pulled a knife as Mr. Green was passing and drew it across the back of his own
3  neck and then pointed it at Mr. Green. (XVIII RT 3051-3053.)

4        James Glover, who also testified for the defense, had known Mr. Fowler since
5  1964. (XVIII RT 3062.) He lived on Mr. Fowler's property for ten years, up until a week
6  before Mr. Fowlers's death. (XVIII RT 3062-3063.) Mr. Glover was aware that Mr.
7  Fowler had a temper, and he had been verbally abusive to Mr. Glover, although never
8  physically violent. However, Mr. Glover saw Mr. Fowler hit, kick, threaten and curse
9  other people with whom he was angry, and he witnessed such episodes within six months
10  of Mr. Fowler's death. (XVIII RT 3064-3065.)

11        Mr. Glover was also aware that Mr. Fowler had long had the habit of picking up
12  young boys, aged 12 to 15 or 16, for sex, finding them among the migrant day laborers
13  and taking them to his home. (XVIII RT 3065-3066.) He would see Mr. Fowler bring
14  boys into the house, and he knew that Mr. Fowler had been arrested and served time as
15  a result of this kind of activity. (XVIII RT 3068.) Mr. Glover had heard from the boys
16  involved that, up until the time of his death, Mr. Fowler would bring boys into his house,
17  get them drunk, and force them to have sex. He also heard from some of the boys that
18  Mr. Fowler hurt some of them. (XVIII RT 3069-3070.)

19        Mr. Glover testified that, on the day that Mr. Fowler was killed, he was present at
20  Mr. Fowler's house and so were Mr. Olivera and petitioner. Furthermore, Mr. Glover
21  worked with Mr. Olivera and petitioner for several hours during yard work. All was well
22  when he was left and he was stunned to learn that Mr. Fowler had been killed. (XVIII
23  RT 3066-3067.)

24        Detective Thompson, of the Sonoma County Sheriff's Department, who
25  interviewed Mr. Olivera, was called as a defense witness. He acknowledged that, in the
26  interview, Mr. Olivera first said that he had told petitioner, in joking fashion, to go and
27  "mooch off of" Mr. Fowler. (XX RT 3404-3405.) Later in the interview, Mr. Olivera
28  stated that he suggested to petitioner that he "grab the satchel," i.e., take Mr. Fowler's

PETITION FOR HABEAS CORPUS AND MEMORANDUM       -14-

1 money. (XX RT 3413.) Mr. Olivera told Detective Thompson that he never specifically
2 told petitioner to rob Mr. Fowler, but that he was attempting to convey to petitioner the
3 idea that he could take Mr. Fowler's money; however, he did not intend to send petitioner
4 to steal – the whole thing was done in a joking fashion. (XX RT 3414-3415.) The actual
5 words used were, "Go fool, fuck him there, and mooch off him." (XX RT 3425.) In the
6 same context, according to Detective Thompson, Mr. Olivera used the word "mooch" as
7 the equivalent to the word rob. (XX RT 3426.) However, in Spanish, the verb "robar"
8 can mean both rob with force or violence or steal, without force or violence. Detective
9 Thompson, who interviewed Mr. Olivera and was certified as bilingual in English in
10 Spanish, stated that he thought it would be more likely that, in Spanish, the word for
11 "grab" would be used to mean "steal," but that "robar" was also possible. (XX RT 3429-
12 3431.) The words that Mr. Olivera actually used were "grab the satchel," by which he
13 explained what he meant when he told petitioner to "chingartelo", or, literally, to "fuck
14 him." (XX RT 3434-3436.) Detective Thompson acknowledged that Mr. Olivera denied
15 using the word "robar" in talking to petitioner, "up to a point." (XX RT 3439-3430.)[26]

16     Petitioner took the stand in his own defense. (XX RT 3441.) He was 15 years old
17 at the time of the killing, living with his parents and attending school, where he was not
18 doing well. (XX RT 3443-3444.)

19     On a few occasions prior to the killing, petitioner had waited on a street corner in
20 Graton for day work. (XX RT 3445.) He met Mr. Olivera, whom he knew by a
21 nickname only, when he was 14. He began spending time with him regularly, drinking
22 beer. (XX RT 3446-3449.)

23     On the day in question, as petitioner got off the bus from school in Graton, he saw
24 Mr. Olivera, who called him over. (XX RT 3450-3451.) Mr. Olivera told petitioner that
25

26 [26] Detective Thompson also agreed that he made it clear to Mr. Olivera before he went to
27 look for petitioner while wearing a wire that what was needed was a confession from
petitioner, in order to corroborate the story that Mr. Olivera had just told the detective.
28 (XX RT 3417-3418.)

1  Mr. Fowler, whom petitioner had never met, was looking for someone to work for him.
2  (XX RT 3449-3450, 3452-3453.) Mr. Olivera also told petitioner that Mr. Fowler had
3  a lot of money and that he had robbed him on a previous occasion. He told petitioner that
4  it would be quite easy to take Mr. Fowler's wallet and run. Mr. Olivera made no mention
5  of sex nor of the possibility that Mr. Fowler might have a weapon. (XX RT 3453-3455.)
6
7  Petitioner got into Mr. Fowler's car without knowing the type of work he would
8  be doing or the pay. On the way, he asked, and he was told that he would be cutting
9  grass. When they arrived at Mr. Fowler's house, the latter told petitioner that the
10 lawnmower was in the house (which petitioner thought a bit strange), and the two went
11 inside. (XX RT 3455-3460.) As he was going with Mr. Fowler, before the stabbing,
12 petitioner decided not to try to rob Mr. Fowler because Mr. Fowler was bigger than he
13 was and, in addition, petitioner did not know where Mr. Fowler was taking him. (XX RT
14 3494-3495.)[27]

15 Once inside, Mr. Fowler, who was a little taller than petitioner and who did not
16 sound like he was old or frail, locked the door and approached petitioner, saying, "You
17 know what I want." (XX RT 3458, 3460-3463.) Petitioner did not know what Mr.
18 Fowler wanted and said so. Mr. Fowler told him, "Don't worry," and petitioner told Mr.
19 Fowler that he wanted to go home. (XX RT 3462-3466.) At that point, Mr. Fowler
20 offered him a cold drink, "to cool off." (XX RT 3466-3467.) Mr. Fowler then moved
21 closer and began touching petitioner's genitals and buttocks, grabbing hard and telling
22 him, "No, you are staying here." (XX RT 3467, 3482-3484.) Mr. Fowler pushed
23 petitioner and he pushed back. Petitioner tried to get away and Mr. Fowler took hold of
24 his shirt and tore it and then touched petitioner again. (XX RT 3484-3486.)

25
26
27
[27] Petitioner told the police that he was "going to rob" Mr. Fowler, but that he "didn't,"
28 that the took Mr. Fowler's wallet and money after he stabbed him. (XXI RT 3630.)

PETITION FOR HABEAS CORPUS AND MEMORANDUM                    -16-

1    By this time, petitioner had backed into the kitchen. He picked up a kitchen knife

2    with a six or seven inch blade. He repeatedly asked Mr. Fowler to take him home and

3    Mr. Fowler refused, telling him to put down the knife and threatening to call the police,

4    to which petitioner responded that he did not care. Mr. Fowler approached again,

5    reaching to grab petitioner's shoulders, and petitioner stabbed him, possibly as many as

6    30 or 40 times – he did not remember how many. He stabbed him until he fell.[28] He was

7    not trying to kill Mr. Fowler, but rather he was afraid and trying to get Mr. Fowler away

8    from him. He did not go to Mr. Fowler's house intending to rob him. (XX RT 3486-

9    3493, 3503.) Petitioner told the police that he had stabbed Mr. Fowler four or five times

10   because he was frightened of going to prison for life.[29] (XX RT 3493-3494.)

11   On cross-examination, petitioner acknowledged that a number of things that he

12   told the police, notably that Mr. Olivera was in the house at the time of the killing, were

13   lies. (XXI RT 3601-3613.)

14   After Mr. Fowler fell dead, petitioner took his wallet and some change, which he

15   later dropped. He took these items because he thought that Mr. Olivera would be outside

16   waiting for him and he wanted to impress him, because Mr. Olivera always treated him

17   like a "little kid." (XX RT 3495-3496.) He was afraid that if he did not get some money

18   from Mr. Fowler, Mr. Olivera would "beat him up."[30] (XX RT 3499.)

19   When he got outside, petitioner met Mr. Olivera. Petitioner did not remember Mr.

20   Olivera going into the house. He told the police that Mr. Olivera did so because he was

21

22   [28] Petitioner did not know at the time of the stabbing if Mr. Fowler had died from the stab wounds. (XX RT 3500.)

23

24   [29] Petitioner also told the police that he stabbed Mr. Fowler because Mr. Fowler touched him as if he wanted to rape him, and petitioner stood by that statement. (XX RT 3502.)

25   At first, petitioner denied stabbing Mr. Fowler at all in his statement to the police. (XX RT 3502.) When he was interviewed, petitioner believed that the stabbing was a much

26   more serious charge than stealing. When he spoke to the police, he denied intending to steal from Mr. Fowler, but, eventually admitted stabbing him. (XX RT 3503.)

27

28   [30] Petitioner had heard that Mr. Olivera had recently beaten someone for no reason. (XX RT 3499.)

PETITION FOR HABEAS CORPUS AND MEMORANDUM                    -17-

1 | frightened and wanted to put the blame on Mr. Olivera. (XX RT 3496-3497.) Petitioner
2 | and Mr. Olivera drove away and as they were driving Mr. Olivera told him to check the
3 | wallet. Petitioner found about $200 and split it with Mr. Olivera. (XX RT 3497-3498.)
4 | They drove somewhere, and Mr. Olivera wiped his fingerprints off the car and told
5 | petitioner to do the same. (XX RT 3500.)

6 | Petitioner did not see Mr. Olivera for several months after the stabbing. For a
7 | while, he avoided the places where the day laborers gathered because he was afraid.
8 | Eventually, he had the encounter with Mr. Olivera during which Mr. Olivera wore the
9 | wire. (XX RT 3500-3501.)³¹ Afterwards, when the police sought to arrest him, petitioner
10 | ran, thinking that the police were going to arrest him for having beer. He did not know
11 | that they wanted him for murder. (XX RT 3501-3502.)

12 | ## REBUTTAL

13 | The prosecution offered evidence that, at the time the police discovered Mr.
14 | Fowler's body, the front door to his house was secured with a chain and locked, and the
15 | back door was ajar. (XXI RT 3649-3651.)

16 |

17 | **THE CALIFORNIA COURTS UNREASONABLY APPLIED CONTROLLING**
   | **SUPREME COURT PRECEDENT IN AFFIRMING PETITIONER'S**
18 | **CONVICTION DESPITE THE CALIFORNIA TRIAL COURT'S FAILURE TO**
   | **PROVIDE THE JURY IN THIS CASE WITH A CLEAR INSTRUCTION THAT,**
19 | **FOR THE FELONY MURDER TO APPLY IN THIS CASE, THE KILLING**
   | **THAT OCCURRED HAD TO BE PART OF A "CONTINUOUS TRANSACTION"**
20 | **WITH THE UNDERLYING FELONIES OF BURGLARY AND ROBBERY.**

21 | Under the Fourteenth Amendment, due process requires that "every fact necessary
22 | to constitute the crime with which [the defendant] is charged" be proved beyond a
23 |

24 | Petitioner exaggerated the number of stab wounds that he remembered inflicting when
25 | he spoke to Mr. Olivera because he wanted to appear "grown up." He later lied to the
   | police, denying what he said to Mr. Olivera about the number of stab wounds that he
26 | inflicted. (XX RT 3501.)
   | Although he minimized his actions at first, because he thought it would "look better," the
27 | essence of what petitioner told the police was true: that Mr. Fowler touched him in a way
   | that made him fear that he was about to be raped, so he stabbed him. (XX RT 3502-
28 | 3503.)

PETITION FOR HABEAS CORPUS AND MEMORANDUM                    -18-

reasonable doubt. *In re Winship,* 397 U.S. 358, 364 (1970). If a trial court fails "to properly instruct the jury regarding an element of the charged crime," the court commits "a constitutional error that deprives the defendant of due process." *Conde v. Henry,* 198 F.3d 734, 740 (9th Cir. 1999) (quoting *Hennessy v. Goldsmith,* 929 F.2d 511, 514 (9th Cir. 1991))

The California Supreme Court has held that one of the elements of felony murder is that the killing and the underlying felony be part of one "continuous transaction" and that if this finding is not made by a jury beyond a reasonable doubt, there is error of constitutional dimension. *People v. Sakarias*, 22 Cal.4th 596, 624 (2000).

In the present case, the facts raised a serious question as to whether the killing in this case occurred during the course of a burglary/robbery or whether the course of events was interrupted by the fact that the decedent, during the episode giving rise to this case, attempted to engage in lewd conduct with petitioner, who was 15 years old at the time.[32] *See* Statement of Facts, *ante.* Indeed, it is clear that the jury was confused on this very issue. As the Court of Appeal described it, the jury signalled its confusion by sending a note: "'What we were trying to find out [was] murder first degree . . . versus the felony first degree murder rule that we're supposed to be looking at[.]'" "[The jury apparently had a difference of opinion as to 'what intent really means, just a thought in your head or is it an actual planned [*sic*; plan in] place with the intent?'" *People v. Lopez*, 2006 Cal. Unpub. Lexis 9375, * 9.

The California Criminal Jury Instructions would have provided the jury with the means to resolve the issue of whether or not the prosecution had proved a "continuous transaction" in this case:

> In order for the People to prove that the defendant is guilty of murder
> under a theory of felony murder [and that the special circumstance of

---

[32] *See* Cal. Pen. Code, § 288(c)(1) (forbidding touching of the genitals of a child 14 or 15 years of age by a person ten years or more older than the child.)

murder committed while engaged in the commission of _____ <*insert felony*> is true], the People must prove that the _____ <*insert felony*> [or attempted _____ <*insert felony*>] and the act causing the death were part of one continuous transaction. The continuous transaction may occur over a period of time and in more than one location.

In deciding whether the act causing the death and the felony were part of *one continuous transaction,* you may consider the following factors:

1. Whether the felony and the fatal act occurred at the same place;

2. The time period, if any, between the felony and the fatal act;

3. Whether the fatal act was committed for the purpose of aiding the commission of the felony or escape after the felony;

4. Whether the fatal act occurred after the felony but while [one or more of] the perpetrator[s] continued to exercise control over the person who was the target of the felony;

5. Whether the fatal act occurred while the perpetrator[s] (was/were) fleeing from the scene of the felony or otherwise trying to prevent the discovery or reporting of the crime;

6. Whether the felony was the direct cause of the death;

AND

7. Whether the death was a natural and probable consequence of the felony.

PETITION FOR HABEAS CORPUS AND MEMORANDUM                    -20-

1    1-500 CALCRIM 549.[33]

2    The instructions given by the trial court did not tell the jury that it was required to

3    find beyond a reasonable doubt that it was required to find that the killing and the

4    underlying felony were part of a continuous transaction, nor did the court explain what

5    that term of art meant nor how to make a determination as to whether the prosecution had

6    proved this element. The Court of Appeal affirmed, writing that

7        In effect, appellant seeks to transmute the continuous transaction doctrine

8        from a convenient formulation of the appellate test for the sufficiency of

9        the evidence of felony murder in arguably borderline situations (see, e.g.,

10       *People v. Sakarias, supra*, 22 Cal.4th at p. 624; *People v. Thompson* (1990)

11       50 Cal.3d 134, 171-172, 266 Cal. Rptr. 309) to an element of the crime.

12       This assertion elevates form over substance. The only actual requirement

13       of the statute is that the homicide be committed "in the perpetration of" the

14       underlying felony. ( § 189.) If the underlying felony and the homicide are

15       parts of one continuous transaction, this is a sufficient condition to satisfy

16       the statutory  requirement, but that does not mean it is a necessary one.

17

18   [33] The California courts adopted the jury instructions known as CALCRIM after this case
was tried. However, trial counsel, relying on *People v. Sakarias*, 22 Cal.4th 596,
19   requested instructions that made the same point:

20       If you find that [petitioner] was in the commission or attempted
         commission of robbery, a violation of California Penal Code Section 211,
21       or First Degree Burglary, a violation of California Penal Code Section 459,
         but have a reasonable doubt that those crimes were in progress by virtue of
22       the unlawful acts of the decedent, you may not convict [petitioner] of
23       "Felony Murder".

24       It is for you the jury to determine that if, finding [petitioner] entered the
         premises with the intent to steal, the burglary and the death of Mr. Fowler
25       were as the result of one continuous transaction for purposes of the felony
         murder rule. If you find that they were not part of one continuous
26       transaction you must find [petitioner] "not guilty" of "felony murder"
27   (I CT 450, 453.)

28

1 *People v. Lopez*, 2006 Cal. Unpub. Lexis at *16-*17. As is clear from *People v.*
2 *Sakarias*, however, the "continuous transaction" requirement is an element of the offense
3 and must necessarily be decided by the jury beyond a reasonable doubt. *People v.*
4 *Sakarias*, 22 Cal.4th at 624-625.

5      Ordinarily, erroneous interpretations of state law and even erroneous jury
6 instructions do not raise federal constutional issues. However, federal habeas relief *is*
7 appropriate if the instructional error is such that raises a reasonable likelihood that the
8 jury was misled and if the misdirection or failure to instruct is sufficiently serious that it
9 renders the trial unfair. *Estelle v. McGuire*, 502 U.S. 62, 70 (1991).

10     In the unusual circumstances of the present case, as the record shows, there was
11 a serious issue as to whether the killing of the victim was part and parcel of a
12 burglary/robbery or whether it was due entirely to the intervening crime committed by the
13 victim if, as petitioner testified, the victim committed a sexual assault on petitioner. The
14 holding of the California Court of Appeal to the contrary was an unreasonable application
15 of Supreme Court precedent. As the California Supreme Court recognized in *People v.*
16 *Sakarias*, 22 Cal.4th at 623, every element of a charged offense must be found by a jury
17 beyond a reasonable doubt, *United States v. Gaudin*, 515 U.S. 506, 510 (1995); *In re*
18 *Winship*, 397 U.S. 358 (1970), and, as *Sakarias* also holds, the "continuous transaction"
19 requirement is an element of the offense. *People v. Sakarias*, 22 Cal.4th at 623. The fact
20 that the jury in this case was not given clear, adequate instructions on the element of
21 "continuous transaction" deprived petitioner or a meaningful opportunity to present a
22 complete defense. *California v. Trombetta,* 467 U.S. 479, 485 (1984). For this reason,
23 the unreasonable interpretation of federal constitutional law made by the California courts
24 had a substantial and injurious effect on the outcome of petitioner's case, and the petition
25 for habeas corpus should be granted.

26
27
28

PETITION FOR HABEAS CORPUS AND MEMORANDUM                    -22-

**CONCLUSION**

For all the foregoing reasons, petitioner respectfully requests that the writ issue.

By his attorney, Specially Appearing

John Ward

John Ward
584 Castro Street, #802
San Francisco, California 94114
(415) 255-4996
State Bar No. 102449

Appearing Specially for Petitioner
MARCO ANTONIO LOPEZ

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCO ANTONIO LOPEZ, | No. |
| Petitioner, | |
| v. | **CERTIFICATE OF SERVICE.** |
| CALIFORNIA DEPARTMENT OF CORRECTIONS, | |
| Respondent. | |

I, Dean D'Onofrio, declare under penalty of perjury that I have, on March 14, 2008, mailed a copy of the accompanying Petition for Habeas Corpus and Motion for Appointment of Counsel on

Office of the Attorney General
455 Golden Gate Avenue - Suite 1100
San Francisco, CA 94102

priority mail postage prepaid.

_____
Dean D'Onofrio

PETITIONER'S MOTION FOR APPOINTMENT OF COUNSEL       Page 1